IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br><br><br><br>vs.<br><br><br><br>PETER JOHN ARENDAS,<br><br>    Defendant. | MEMORANDUM DECISION AND ORDER DENYING MOTION FOR INVOLUNTARY MEDICATION DURING HOSPITALIZATION TO RESTORE COMPETENCY<br><br><br><br><br><br>Case No. 1:10-CR-123 TS |

This matter is before the Court for a determination of Defendant's competency as well as the United States' Motion for Involuntary Medication During Hospitalization to Restore Competency. For the reasons discussed below, the Court finds that Defendant is not competent to stand trial and the Court will deny the Motion.

I.  BACKGROUND

Defendant is charged with two counts of threatening

to assault, kidnap, and murder a United States Postal Service Clerk whose killing would be a crime under 18 U.S.C. § 1114, with intent to impede, intimidate, and interfere with such official while engaged in the performance of official duties and with intent to retaliate against such official and law enforcement officer on

1

account of the performance of official duties, all in violation of Title 18, United States Code, Section 115.[1]

The Court has held three competency hearings in this matter. In the first hearing, held on May 29, 2011, the Court found that Defendant was competent to stand trial. Subsequently, the Court received an affidavit from Dr. Lisa Hope—a forensic psychologist who had evaluated Defendant—and correspondence from the Defendant that caused the Court to reconsider its previous finding. As a result, the Court held a second hearing on July 28, 2011, which culminated in the Court's finding that a second competency evaluation was necessary.

Defendant was then evaluated by Dr. Jeremiah Dwyer, who adjudged that Defendant was not competent to stand trial. After holding a third competency hearing in which the Court considered Dr. Dwyer's report as well as other evidence, the Court found that Defendant was not competent to stand trial. In an order dated March 7, 2012, the Court committed Defendant to the custody of the Attorney General under 18 U.S.C. § 4241(d) to "hospitalize the defendant for treatment in a suitable facility for . . . a reasonable time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward."[2]

On May 31, 2012, Defendant was committed to the Mental Health Unit of the U.S. Medical Center for Federal Prisoners for competency restoration treatment. Tasha R. Phillips, Psy.M. and Richart L. DeMier, Ph.D., prepared a report regarding Defendant's treatment and

---

[1]Docket No. 1, at 1–3.

[2]Docket No. 50, at 6 (quoting 18 U.S.C. § 4241(d)).

competency to stand trial. In their report, Phillips and DeMier found that Defendant has bipolar disorder characterized by symptoms of mania. They further stated that, although Defendant has "both a factual and rational understanding of the nature and potential consequences of the charges against him, his severe mental illness is likely to interfere with his ability to effectively communicate with his attorney, to participate in court proceedings, and to make rational decisions regarding his legal case."[3] Phillips and DeMier also noted that since the time Defendant was admitted to the Mental Health Unit his mental health had significantly declined and that without additional psychiatric medication (which Defendant has refused), he will not become competent to stand trial.

On October 16, 2012, the Court granted the parties' stipulated motion for an order directing the Bureau of Prisons ("BOP") to produce a report that includes an analysis of the factors for forcibly medicating an incompetent defendant, as delineated in *Sell v. United States*.[4][5] The Court received the BOP's report regarding the *Sell* factors on October 24, 2012. In the *Sell* report, Phillips and DeMier stated that, in this case: (1) treatment of Defendant's bipolar disorder with psychiatric medication is medically appropriate; (2) alternative, less intrusive treatments are not available because "[m]ood stabilizing medications represent the best, if not the only, treatment likely to stabilize his illness"[6]; (3) "based on current scientific knowledge of psychiatry

---

[3]Docket No. 64, at 7.

[4]539 U.S. 166 (2003).

[5]Docket No. 70.

[6]Docket No. 73, at 3

and on experiences with many individuals with [a] similar disorder,"[7] treatment is substantially likely to restore competency; and (4) although "there is always some risk of side effects involved in the administration of medications,"[8] side effects will not undermine the fairness of trial.

Pursuant to the Court's order of October 16, 2012, the BOP did not consider the first *Sell* factor—whether important government interests are at stake. The United States subsequently filed its Motion for Involuntary Medication During Hospitalization to Restore Competency, arguing that the *Sell* factors are satisfied in this case and involuntary medication is therefore appropriate. Defendant responded by arguing that the *Sell* factors are not met and, as a result, he should not be forcefully medicated.

On December 18, 2012, the Court held a hearing in which Phillips and DeMier testified regarding their report and the Court heard argument on whether the *Sell* factors are satisfied such that Defendant should be forcefully medicated. On December 19, 2012, the Court issued an order in which it stated that an analysis of Defendant's dangerousness would aid the Court's determination of whether the government has an important governmental interest in forcibly medicating Defendant. Accordingly, in the December 19 order, the Court requested that the BOP provide a report that includes an analysis of whether, pursuant to 18 U.S.C. § 4246, Defendant suffers "from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another . . . ."[9]

---

[7] *Id.*

[8] *Id.*

[9] Docket No. 82, at 1.

The United States subsequently moved the Court to reconsider its December 19 order, stating that the government had received supplemental information from the BOP that a § 4246 dangerousness assessment performed by the BOP at that procedural juncture of the case was highly unusual. On February 2, 2013, the Court granted the motion to reconsider and ordered the parties to file a stipulated designation of a local expert who could opine on Defendant's dangerousness. The Court granted the parties' stipulated designation of Dr. Jonathan Bone as an expert on February 21, 2013, and ordered that he provide a report that includes an opinion as to Defendant's dangerousness.

On April 26, 2013, Dr. Bone provided his report to the Court. In his report, Dr. Bone used the HCR-20—"a 20-item, formal, structured approach to assessing future violence"[10]—to estimate Defendant's future dangerousness and to determine his likelihood of civil commitment under Utah law. Dr. Bone found that Defendant's total score on the HCR-20 is 33/40, and noted that "[t]his score does not offer a probability of risk. The state of psychological violence risk assessment field suggests using this number as a guide along a continuum of *low, moderate, and high risk* for future violence. Based *solely* on this instrument Mr. Arendas falls in the *high risk* category . . . ."[11] Dr. Bone noted, however, that Defendant's "age and the relative lack of history of actual physical violence reduce his risk to engage in future violence."[12] Thus, Dr. Bone's

---

[10]Docket No. 105, at 7.

[11]*Id.* at 11.

[12]*Id.*

5

opinion is that "Mr. Arendas [poses a] *moderate risk* to engage in violent behavior toward a person or persons or to enact serious damage to the property of another."[13]

Dr. Bone also believes that "there is some data to support involuntary commitment under Utah's Civil Commitment Statute."[14] On this point, Dr. Bone states that Defendant meets the following civil commitment criteria:

1. He has a legally relevant mental illness, namely Bipolar I Disorder.
2. As a result of his mental illness, he lacks the ability to engage in a rational decision-making process regarding the acceptance or rejection of treatment.
3. There is no less restrictive alterative, other than being committed to a local mental health authority (LMHA) (this does not necessarily mean committed to a specific facility, such as the Utah State Hospital, or a locked facility, as one can be committed to a LMHA for outpatient treatment).
4. A number of LMHA's [sic] in multiple counties in Utah could provide treatment that is "adequate and appropriate," with the caveat that there is some form of judicial supervision.

    The fifth, and highly important, component to the civil commitment statute relates to the examinee's risk of "substantial danger" that is a result of their mental illness. This area is less clear, as Mr. Arendas is a higher risk to engage in future violence, but he denies *current* suicidal or homicidal ideation, plan, or intent. He expressed no plans to seek retribution against the entities with whom his contact resulted in criminal charges. Of note, the majority of his violent behavior (aside from the alleged instant offense behavior) has apparently occurred while he has been in custody. Furthermore, based on his reported and documented transient lifestyle over many years, it appears that, despite having a longstanding history of active symptoms of mental illness, he has demonstrated capability of providing the basic necessities of life, such as food, clothing, and shelter. Indeed, he was able to articulate available resources in Weber and Davis Counties in Utah, including where to obtain clothing, temporary employment, psychiatric care (despite his belief he does not need any), and the possibility of transportation to a different jurisdiction. However, findings from this evaluation

---

[13]*Id.*

[14]*Id.*

place him at higher risk and, given his paranoia and mania, his behavior is
significantly less predictable than it would be if he were successfully treated.[15]

Dr. Bones' ultimate opinion is that Defendant "meets criteria for civil commitment."[16] Dr. Bones points out, however, that "civil commitment does not necessarily entail admission to a psychiatric hospital. Indeed, Utah statute indicates that the examinee should be committed to the least restrictive environment."[17]

## II.  DISCUSSION

Before the Court are two issues. First, the Court must determine whether Defendant's "mental condition is so improved that trial may proceed,"[18]—that is, whether he is currently competent to stand trial. Second, if Defendant remains incompetent to stand trial, the Court must determine whether involuntary medication to restore competency is appropriate. These issues are discussed in turn below.

A.   COMPETENCY

"[T]he test for competency is whether the defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.'"[19]  "When assessing

---

[15] *Id.* at 12.

[16] *Id.*

[17] *Id.*

[18] 18 U.S.C. § 4241(d)(2)(A).

[19] *United States v. Mackovich*, 209 F.3d 1227, 1231–32 (10th Cir. 2000) (quoting *Drope v. Missouri*, 420 U.S. 162, 171 (1975)).

a defendant's competence, 'the district court may rely on a number of factors, including medical opinion and the court's observation of the defendant's comportment.'"[20]

In determining whether Defendant is competent, the Court considers both the experts' report and recommendation as well as the evidence presented at the December 12 and May 2 hearings. The Tenth Circuit "has long recognized that '[t]he presence of some degree of mental disorder in the defendant does not necessarily mean that he is incompetent to . . . assist in his own defense.'"[21] Similarly, a Defendant can be found competent for trial even though there is a recommendation that a defendant's mental condition be treated with drugs.[22]

The Court has previously found Defendant incompetent to stand trial. Further, according to Phillips and DeMier's report and testimony at the December 12 hearing, Defendant's condition has only worsened since that time. As the Court's observation of Defendant at the December 12 and May 2 hearings comports with the experts' opinion, the Court adopts the experts' opinion and finds that Defendant remains incompetent to stand trial.

B.  INVOLUNTARY MEDICATION

"[A] court, when asked to order involuntary medication to render a defendant competent to stand trial, at the outset 'should ordinarily determine whether the Government seeks, or has first sought, permission for forced administration of drugs on . . . *Harper*-type grounds; and if

---

[20] *Id*. at 1232 (quoting *United States v. Boigegrain*, 155 F.3d 1181, 1189 (10th Cir. 1998)).

[21] *Id*. (quoting *Wolf v. United States*, 430 F.2d 443, 445 (10th Cir. 1970)).

[22] *Id*.

not, why not.'"[23] Only if a court finds that there are no *Harper*-type grounds for involuntary medication should it then determine whether the factors in *Sell* provide a basis for forcible medication.[24]

In *Washington v. Harper*,[25] the Supreme Court held that involuntary administration of antipsychotic drugs is permissible "if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest."[26] These circumstances do not apply to Defendant as Phillips and DeMier stated, in a report of September 11, 2012, that "because Mr. Arendas is not imminently dangerous to himself or others, and because he was not gravely disabled, staff at this facility had no basis to prescribe, or modify, psychiatric medications without his consent."[27] Phillips also testified at the December 18 hearing that, although Defendant's symptoms were getting worse, they never rose to the level of physical aggression. The Court therefore finds that there are no applicable *Harper*-type grounds to forcibly medicate Defendant.

The Court next considers whether the factors set forth in *Sell* provide a basis for involuntarily medicating Defendant. The law is clear that Defendant "'possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due

---

[23] *United States v. Morrison*, 415 F.3d 1180, 1185 (10th Cir. 2005) (quoting *Sell*, 539 U.S. at 183)).

[24] *See id.* at 1181.

[25] 494 U.S. 210 (1990).

[26] *Id.* at 227.

[27] Docket No. 64, at 10.

Process Clause of the Fourteenth Amendment.'"[28] However, in *Sell* the Supreme Court recognized "the right of the government to seek involuntary medication of a non-dangerous defendant who, even after months of hospitalization, is found incompetent to stand trial."[29] The Court in *Sell* stated "that instances of involuntary medication of a non-dangerous defendant solely to render him competent to stand trial should be 'rare' and occur only in limited circumstances.'"[30] To effectuate this policy, *Sell* set forth a four-part test that must be satisfied before granting a motion a motion for involuntary medication.

> "First, a court must find that important governmental interests are at stake." Bringing defendants charged with serious crimes to trial is an important government interest, but the importance of that interest may be reduced by specific circumstances, such as the amount of time the defendant has already spent in confinement (which would be credited toward any eventual sentence) or the possibility of civil commitment absent a criminal trial. Second, a court must find that the medication is both "substantially likely to render the defendant competent to stand trial" and "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." Third, "[t]he court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results," and "must consider less intrusive means for administering the drugs," such as a court order directing the defendant to take the medication. And fourth, "the court must conclude that administration of the drugs is medically appropriate, *i.e.*, in the patient's best medical interest in light of his medical condition."[31]

---

[28] *United States v. Valenzuela-Puentes*, 479 F.3d 1220, 1223 (10th Cir. 2007) (quoting *Harper*, 494 U.S. at 221–22).

[29] *Id.* (citing *Sell*, 539 U.S. 166).

[30] *Id.* (quoting *Sell*, 539 U.S. at 169, 180).

[31] *Morrison*, 415 F.3d at 1181 (quoting *Sell*, 539 U.S. at 180–81).

1.	IMPORTANT GOVERNMENTAL INTEREST

The first factor—whether there are important government interests at stake—is a legal question that considers "whether involuntary administration of antipsychotic drugs 'is necessary significantly to further important governmental trial-related interests.'"[32] "In other words, '[h]as the Government, in light of the efficacy, the side effects, the possible alternatives, and the medical appropriateness of a particular course of antipsychotic drug treatment, shown a need for that treatment sufficiently important to overcome the individual's protected interest in refusing it?'"[33]

While the "Government's interest in bringing to trial an individual accused of a serious crime is important . . . [c]ourts must consider the facts of the individual case in evaluating the Government's interest in prosecution."[34] "Special circumstances may lessen the importance of that interest."[35] In *Sell*, the Court gave two examples of such circumstances. "In the first, a defendant, in the absence of court-ordered administration of psychiatric medication, might suffer lengthy civil commitment for mental illness 'that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime.'"[36] In the second, "when the amount of time the defendant is confined pending determination of competency is in parity

---

[32] *United States v. Bradley*, 417 F.3d 1107, 1113 (10th Cir. 2005) (quoting *Sell*, 539 U.S. at 179).

[33] *Id.* (quoting *Sell*, 539 U.S. at 183).

[34] *Id.* at 1116 (quoting *Sell*, 539 U.S. at 180) (alterations in original).

[35] *Id.* (quoting *Sell*, 539 U.S. at 180).

[36] *Id.* (quoting *Sell*, 539 U.S. at 180).

with an expected sentence in the criminal proceeding, the Government may no longer be able to claim an important interest in prosecution."[37]

Here, there is no dispute that Defendant is charged with a serious crime. The Court's analysis therefore turns to whether "special circumstances" lessen the government's interest in prosecuting this case such that it is outweighed by Defendant's liberty interest.[38]

The first special circumstance is implicated where the Defendant is likely to receive lengthy civil commitment. The "federal civil commitment statute requires a showing that the proposed patient presents 'a substantial risk of bodily injury to another person or serious damage to property of another.'"[39] The Utah civil commitment statute requires a showing that the patient presents "a mental illness which poses a substantial danger . . . to self or others requiring involuntary commitment . . . ."[40] Both statutes require that their respective elements be satisfied by clear and convincing evidence.[41] Clear and convincing evidence is evidence that "places in the ultimate factfinder an abiding conviction that the truth of its factual contentions are 'highly probable.'"[42]

---

[37]*Id.*

[38]*Id.* (quoting *Sell*, 539 U.S. at 180).

[39]*Id.* (quoting 18 U.S.C. § 4246(a)).

[40]Utah Code Ann. § 62A-15-631.

[41]*Id.* § 62A-15-631(10); 18 U.S.C. § 4246(d).

[42]*Valenzuela-Puentes*, 479 F.3d at 1228 (quoting C. McCormick, Law of Evidence § 320 at 679 (1954)).

Although Dr. Bones' ultimate opinion is that Defendant "meets criteria for civil commitment,"[43] he states that the evidence that Defendant poses a substantial risk of danger is "less clear," because (1) Defendant "denies *current* suicidal or homicidal ideation, plan, or intent"; (2) Defendant "expressed no plans to seek retribution against the entities with whom his contact resulted in criminal charges"; (3) "the majority of [Defendant's] violent behavior . . . has apparently occurred while he has been in custody"; and (4) "he has demonstrated capability of providing the basic necessities of life, such as food, clothing, and shelter."[44] Additionally, Dr. Bones states that Defendant poses a "moderate," not "substantial" risk of danger. In light of these moderating facts, it cannot be said that the evidence that Defendant poses a substantial risk of danger is clear and convincing. Additionally, Dr. Bones' report appears to suggest that Defendant would likely be committed on an outpatient, not long-term basis. The Court therefore finds that this special circumstance does not apply.

The second special circumstance does apply to this case. The Tenth Circuit in *United States v. Bradley* interpreted the second special circumstance to include situations where "the amount of time the defendant is confined pending determination of competency is in parity with an expected sentence in the criminal proceeding."[45] The most recent binding caselaw in this circuit has clarified that district courts should consider both the statutory maximum sentence and

---

[43]Docket No. 105, at 12.

[44]*Id.*

[45]*Bradley*, 417 F.3d at 1113.

the expected sentence under the sentencing guidelines in determining whether the time a defendant has been confined is in parity with his expected sentence.[46]

Defendant faces a maximum statutory sentence of 20 years and a likely guideline sentence of 18 to 24 months or 30 to 37 months.[47] As of the date of this Order, he has been in custody for roughly 31 months. Assuming no complications, his forceful medication would result in him regaining competency in two to four months, while another two to six months would likely be necessary to prepare for trial. Thus, in a best case scenario, Defendant will have been in custody for a minimum of 35 to 41 months before this case can be ready for trial. If convicted, additional time would be required for the preparation of a presentence report and a sentencing hearing. Because the length of Defendant's confinement is roughly equal to his likely sentence, the Court finds that the government's interest in prosecution is outweighed by Defendant's liberty interest.

This conclusion is supported by the Tenth Circuit's opinion in *United States v. Valenzuela-Puentes*. In that case, the defendant had been confined for fourteen months when the district court ordered him to be involuntarily medicated. By the time the Tenth Circuit decided

---

[46] *Valenzuela-Puentes*, 479 F.3d at 1227 (comparing the defendant's time in confinement pending trial to both the statutory maximum penalty of twenty years' imprisonment and his likely six to eight-year sentence under the sentencing guidelines). *But see United States v. Archuleta*, 218 Fed. App'x 754, 759 (10th Cir. 2007) (unpublished) (affirming district court's determination that it was appropriate to compare the defendant's time in custody pending trial only to the statutory maximum sentence). As an unpublished decision, *Archuleta* is not binding precedent. The Court will therefore follow the precedent set in *Valenzuela-Puentes*.

[47] As no presentence report has been prepared, these figures are based on counsels' estimates of Defendant's likely sentence under the sentencing guidelines.

the defendant's appeal he had been imprisoned for 43 months. Although the court was "not comfortable with the length of time it has taken to prosecute this case" the court was "not prepared to say that the government's interest ha[d] been lessened to such an extent as to render it less weighty than Mr. Valenzuela-Puentes's interest."[48] This was the case because, assuming Valenzuela-Puentes gained competency for trial, he still faced "the possibility of a sixteen-year sentence and the likelihood of a remaining two to four-year sentence."[49] The court noted, however, that "the clock is ticking . . . and we urge the government to aggressively pursue its interest or risk having it diminish to the point where dismissal of the charges is the only reasonable option."[50]

Here, assuming Defendant regains competency, he faces the possibility of a statutory maximum of an additional seventeen-year sentence but the likelihood of serving no time after receiving credit for time served. Thus, unlike in *Valenzuela-Puentes*, the time to prosecute this case has passed and the government's interest "has diminished to the point where dismissal of the charges is the only reasonable option."[51]

The Court finds that the government's interest in prosecuting this case is outweighed by Defendant's liberty interests in refusing medication. This *Sell* factor is therefore not met.

---

[48] *Valenzuela-Puentes*, 479 F.3d at 1227.

[49] *Id.*

[50] *Id.*

[51] *Id.*

2.	LIKELY TO RENDER COMPETENT

Under the second *Sell* factor, the Court, by clear and convincing evidence, "must find that the medication is both 'substantially likely to render the defendant competent to stand trial' and 'substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair.'"[52]

Here, Phillips and DeMier's report does not provide clear and convincing evidence that the proposed treatment is substantially likely to render Defendant competent. In the court-ordered evaluation, the experts state that "[a]lthough a positive treatment response cannot be guaranteed, it is a reasonable expectation, based on current scientific knowledge in psychiatry and on experiences with many individuals with similar disorder[s], that Mr. Arendas could be restored to competency following a period of treatment in a structured setting, which included a regimen of psychiatric medications."[53] Even if the experts' report were based on undisputed evidence, a "reasonable expectation" that Defendant "could be restored to competency" does not meet *Sell*'s requirement that the government produce clear and convincing evidence of a substantial likelihood that Defendant will regain competency.

The December 12 hearing also does not support a finding that forcible medication is substantially likely to rehabilitate Defendant. Phillips testified at the hearing that both the literature and studies provide support for her conclusion that antipsychotic medication is likely to effectively treat Defendant's bipolar disorder. The only literature or study Phillips referenced

---

[52]*Morrison*, 415 F.3d at 1181 (quoting *Sell*, 539 U.S. at 180–81).

[53]Docket No. 73, at 3.

was a study in which 132 defendants with psychotic disorders were medicated in an attempt to restore them to competency. The medication restored 79 of the defendants to competency, a 59.8% success rate. While only three of the defendants in the study had bipolar disorder (the same disorder ailing Defendant), all three were rendered competent. Even assuming this data reliably predicts the likelihood that Defendant would regain competency, a roughly 60% success rate does not foster "an abiding conviction [that it is] 'highly probable'"[54] that the medication will restore Defendant.[55] Moreover, it is troubling that only three of the defendants in the study suffered from bipolar disorder. While all three regained competency, three defendants is not a statistically significant sample size.

Finally, at the December 12 hearing, the expert witnesses admitted that the only medical records they reviewed in making their recommendation on the *Sell* factors were Defendant's records from the BOP and Salt Lake City Jail. The experts conceded that although other records would have been helpful in their analysis, they did not attempt to obtain them. "Expert testimony regarding the likelihood of success must reflect an individualized assessment of the patient's medical history and mental illness."[56] Here, the experts' failure to obtain and consider

---

[54] *Valenzuela-Puentes*, 479 F.3d at 1228 (quoting C. McCormick, Law of Evidence § 320 at 679).

[55] *See United States v. Rivera-Morales*, 365 F. Supp. 2d 1139, 1141 (S.D. Cal. 2005) *aff'd*, 160 F. App'x 648 (9th Cir. 2005) ("Although the court declines to determine the exact percentage of success that equates with a substantial likelihood that a defendant's competency is restored, it is clear that a chance of success that is simply more than a 50% chance of success does not suffice to meet this standard.").

[56] *United States v. Austin*, 606 F. Supp. 2d 149, 152 (D.D.C. 2009) (citing *United States v. Evans*, 404 F.3d 227, 241 (4th Cir. 2005) (expert testimony that did not consider "all of the particular characteristics of the individual defendant" was insufficient to sustain government's

Defendant's other medical records constituted a failure to provide a sufficiently individualized analysis of Defendant's likely response to antipsychotic medication.

The government's evidence regarding the likelihood of side effects that could interfere with trial is more convincing. In their report regarding this factor, Phillips and DeMier state that "the vast majority of patients report no serious side effects, and nuisance side effects can be effectively addressed."[57] At the December 12 hearing, the experts further explained that BOP personnel actively monitor patients to further reduce the risk of side effects. No data or evidence to the contrary was elicited. Based on this evidence, the Court concludes that it is substantially unlikely that side effects would significantly affect Defendant's ability to assist in his own defense. Nevertheless, because the government failed to show that it is substantially likely that medication would result in Defendant's competency, this *Sell* factor is not satisfied.

### 3. NO ALTERNATIVES

The third factor—that there are no less intrusive, effective treatments—cannot be satisfied where the government has not established that administration of the drugs is substantially likely to rehabilitate Defendant.[58] The third *Sell* factor is therefore not satisfied in this case.

---

burden).

[57] Docket No. 73, at 4.

[58] *Valenzuela-Puentes*, 479 F.3d at 1227.

As the government has failed to establish three of the *Sell* factors, the government's Motion for Involuntary Medication must be denied. The Court need not determine whether the remaining factor—whether medication is medically appropriate—is satisfied.

IV. CONCLUSION

It is therefore

ORDERED that Defendant is not competent to stand trial. It is further

ORDERED that the government's Motion for Involuntary Medication (Docket No. 74) is DENIED. It is further

ORDERED that Speedy Trial time is excluded pursuant to 18 U.S.C. §§ 3161(h)(1)(a).

DATED   May 6, 2013.

BY THE COURT:

_____
TED STEWART
United States District Judge